Akter v Interboro Ins. Co. (2024 NY Slip Op 51483(U))

[*1]

Akter v Interboro Ins. Co.

2024 NY Slip Op 51483(U)

Decided on October 31, 2024

Supreme Court, Bronx County

Gomez, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on October 31, 2024
Supreme Court, Bronx County

Farjahan Akter, Plaintiff(s),

against
Interboro Insurance Company, Defendant(s).

Index No. 31586/19E

Counsel for Plaintiff: Brian R. Hoch
Counsel for Defendant: Traub Lieberman Straus & Shrewsberry, LLP 

Fidel E. Gomez, J.

In this action for breach of contract, defendant seeks an order pursuant to CPLR § 3212 granting it summary judgment and dismissing the complaint. Saliently, defendant contends that in denying plaintiff's claim for property damage to her home, it did not breach the insurance policy since plaintiff failed to comply with the conditions precedent to coverage thereunder. Plaintiff opposes the instant motion, asserting, inter alia, that because she has not had an opportunity to depose defendant, the instant motion is premature.
For the reasons that follow hereinafter, defendant's motion is granted.
The instant action is for breach of contract. The complaint alleges that in July 2017, defendant issued an insurance policy to defendant, insuring the premises located at 1455 Minsford Place, Bronx, NY 10460 (1455). The policy covered 1455 from July 20, 2017 until July 20, 2018. On March 24, 2018, 1455 sustained substantial wind and water damage. Plaintiff made a claim under the policy, seeking $60,320 to repair 1455. Despite plaintiff fulfilling all the requirements under the policy, defendant has failed to pay the claim. Based on the foregoing, plaintiff alleges that defendant has breached the policy between the parties.
Defendant's motion seeking summary judgment and dismissal of the complaint is granted. Significantly, defendant establishes, beyond any factual dispute, that plaintiff failed to cooperate with defendant's investigation of her claim, a precondition to coverage under the policy. Moreover, for the same reason, plaintiff's failure to cooperate constitutes a breach of the policy thereby precluding her cause of action for breach of contract.
Standard of Review
The proponent of a motion for summary judgment carries the initial burden of tendering sufficient admissible evidence to demonstrate the absence of a material issue of fact as a matter of law (Alvarez v Prospect Hospital, 68 NY2d 320, 324 [1986]; Zuckerman v City of New York, 49 NY2d 557, 562 [1980]). Thus, a defendant seeking summary judgment must establish prima [*2]facie entitlement to such relief by affirmatively demonstrating, with evidence, the merits of the claim or defense, and not merely by pointing to gaps in plaintiff's proof (Mondello v DiStefano, 16 AD3d 637, 638 [2d Dept 2005]; Peskin v New York City Transit Authority, 304 AD2d 634, 634 [2d Dept 2003]). There is no requirement that the proof be submitted by affidavit, but rather that all evidence proffered be in admissible form (Muniz v Bacchus, 282 AD2d 387, 388 [1st Dept 2001], revd on other grounds Ortiz v City of New York, 67 AD3d 21, 25 [1st Dept 2009]). Notably, the court can consider otherwise inadmissible evidence, when the opponent fails to object to its admissibility and instead relies on the same (Niagara Frontier Tr. Metro Sys. v County of Erie, 212 AD2d 1027, 1028 [4th Dept 1995]), or when the opponent fails to object to the admission of such evidence (Bank of New York Mellon v Gordon, 171 AD3d 197, 202 [2d Dept 2019] ["However, as a general matter, a court should not examine the admissibility of evidence submitted in support of a motion for summary judgment unless the nonmoving party has specifically raised that issue in its opposition to the motion."]; see Greene v Kevin D. Greene, LLC, 188 AD3d 1012, 1013 [2d Dept 2020]; Rosenblatt v St. George Health and Racquetball Assoc., LLC, 119 AD3d 45, 55 [2d Dept 2014] ["Thus, the Supreme Court erred when it, sua sponte, determined that the plaintiff's deposition transcript was inadmissible because of the lack of a certification and, as a result, concluded that Eastern Athletic had failed to meet its prima facie burden."]). The latter is premised on the well settled principle that a court ought not raise arguments never raised by the parties themselves (Misicki v Caradonna, 12 NY3d 511, 519 [2009] ["We are not in the business of blindsiding litigants, who expect us to decide their appeals on rationales advanced by the parties, not arguments their adversaries never made."]).
Once movant meets his initial burden on summary judgment, the burden shifts to the opponent who must then produce sufficient evidence, generally also in admissible form, to establish the existence of a triable issue of fact (Zuckerman at 562). It is worth noting, however, that while the movant's burden to proffer evidence in admissible form is absolute, the opponent's burden is not. As noted by the Court of Appeals,
[t]o obtain summary judgment it is necessary that the movant establish his cause of action or defense 'sufficiently to warrant the court as a matter of law in directing summary judgment' in his favor, and he must do so by the tender of evidentiary proof in admissible form. On the other hand, to defeat a motion for summary judgment the opposing party must 'show facts sufficient to require a trial of any issue of fact.' Normally if the opponent is to succeed in defeating a summary judgment motion, he too, must make his showing by producing evidentiary proof in admissible form. The rule with respect to defeating a motion for summary judgment, however, is more flexible, for the opposing party, as contrasted with the movant, may be permitted to demonstrate acceptable excuse for his failure to meet strict requirement of tender in admissible form. Whether the excuse offered will be acceptable must depend on the circumstances in the particular case
(Friends of Animals v Associated Fur Manufacturers, Inc., 46 NY2d 1065, 1067-1068 [1979] [internal citations omitted]). Accordingly, generally, if the opponent of a motion for summary judgment seeks to have the court consider inadmissible evidence, he must proffer an excuse for failing to submit evidence in admissible form (Johnson v Phillips, 261 AD2d 269, 270 [1st Dept 1999]).
When deciding a summary judgment motion the role of the Court is to make determinations as to the existence of bonafide issues of fact and not to delve into or resolve [*3]issues of credibility. As the Court stated in Knepka v Talman (278 AD2d 811, 811 [4th Dept 2000]),
[s]upreme Court erred in resolving issues of credibility in granting defendants' motion for summary judgment dismissing the complaint. Any inconsistencies between the deposition testimony of plaintiffs and their affidavits submitted in opposition to the motion present issues for trial
(see also Yaziciyan v Blancato, 267 AD2d 152, 152 [1st Dept 1999]; Perez v Bronx Park Associates, 285 AD2d 402, 404 [1st Dept 2001]). Accordingly, the Court's function when determining a motion for summary judgment is issue finding, not issue determination (Sillman v Twentieth Century Fox Film Corp., 3 NY2d 395, 404 [1957]). Lastly, because summary judgment is such a drastic remedy, it should never be granted when there is any doubt as to the existence of a triable issue of fact (Rotuba Extruders v Ceppos, 46 NY2d 223, 231 [1978]). When the existence of an issue of fact is even debatable, summary judgment should be denied (Stone v Goodson, 8 NY2d 8, 12 [1960]).
Pursuant to CPLR § 3212(f), a motion for summary judgment will be denied if it appears that facts necessary to oppose the motion exist but are unavailable to the opposing party. Denial is particularly warranted when the facts necessary to oppose the motion are within the exclusive knowledge of the moving party (Franklin National Bank of Long Island v De Giacomo, 20 AD2d 797, 297 [2d Dept 1964]; De France v Oestrike, 8 AD2d 735, 735-736 [2d Dept 1959]; Blue Bird Coach Lines, Inc. v 107 Delaware Avenue, N.V., Inc, 125 AD2d 971, 971 [4th Dept 1986]). However, when the information necessary to oppose the instant motion is wholly within the control of the party opposing summary judgment and could be produced via sworn affidavits, denial of a motion for summary judgment pursuant to CPLR § 3212(f) will be denied (Johnson v Phillips, 261 AD2d 269, 270 [1st Dept 1999).
A party claiming ignorance of facts critical to defeat a motion for summary judgment is only entitled to further discovery and denial of a motion for summary judgment if he or she demonstrates that reasonable attempts were made to discover facts which, as the opposing party claims, would give rise to a triable issue of fact (Sasson v Setina Manufacturing Company, Inc., 26 AD3d 487, 488 [2d Dept 2006]; Cruz v Otis Elevator Company, 238 AD2d 540, 540 [2d Dept 1997]). Implicit in this rationale is that the proponent of further discovery must identify facts, which would give rise to triable issues of fact. This is because a court cannot condone fishing expeditions and as such, "[m]ere hope and speculation that additional discovery might uncover evidence sufficient to raise a triable issue of fact is not sufficient" (Sasson at 501). Thus, additional discovery should not be ordered, where the proponent of the additional discovery has failed to demonstrate that the discovery sought would produce relevant evidence (Frith v Affordable Homes of America, Inc., 253 AD2d 536, 537 [2d Dept 1998]).
Notwithstanding the foregoing, CPLR § 3212(f) mandates denial of a motion for summary judgment when a motion for summary judgment is patently premature, meaning when it is made prior to the preliminary conference, if no discovery has been exchanged (Gao v City of New York, 29 AD3d 449, 449 [1st Dept 2006]; Bradley v Ibex Construction, LLC, 22 AD3d 380, 380-381 [1st Dept 2005]; McGlynn v. Palace Co., 262 AD2d 116, 117 [1st Dept 1999]). Under these circumstances, the proponent seeking denial of a motion as premature need not demonstrate what discovery is sought, that the same will lead to discovery of triable issues of fact or the efforts to obtain the same have been undertaken (id.). In Bradley, the court denied plaintiff's motion for summary judgment as premature, when the same was made prior to the [*4]preliminary conference (Bradley at 380). In McGlynn, the court denied plaintiff's motion seeking summary judgment, when the same was made after the preliminary conference but before defendant had obtained any discovery whatsoever (McGlynn at 117).
Applicable Law
It has long been held that absent a violation of law or some transgression of public policy, people are free to enter into contracts, making whatever agreement they wish, no matter how unwise they may seem to others (Rowe v Great Atlantic & Pacific Tea Company, Inc., 46 NY2d 62, 67-68 [1978]). Consequently, when a contract dispute arises, it is the court's role to enforce the agreement rather than reform it (Grace v Nappa, 46 NY2d 560, 565 [1979]). In order to enforce the agreement, the court must construe it in accordance with the intent of the parties, the best evidence of which being the very contract itself and the terms contained therein (Greenfield v Philles Records, Inc., 98 NY2d 562, 569 [2002]). It is well settled that "when the parties set down their agreement in a clear, complete document, their writing should be enforced according to its terms" (Vermont Teddy Bear Co., Inc. v 583 Madison Realty Company, 1 NY3d 470, 475 [2004] [internal quotation marks omitted]). Moreover, "a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms" (Greenfield at 569). Accordingly, courts should refrain from interpreting agreements in a manner which implies something not specifically included by the parties, and courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing (Vermont Teddy Bear Co., Inc. at 475). This approach serves to preserve "stability to commercial transactions by safeguarding against fraudulent claims, perjury, death of witnesses [and] infirmity of memory" (Wallace v 600 Partners Co., 86 NY2d 543, 548 [1995] [internal quotation marks omitted]).
The proscription against judicial rewriting of contracts is particularly important in real property transactions, where commercial certainty is paramount, and where the agreement was negotiated at arm's length between sophisticated, counseled business people (Vermont Teddy Bear Co., Inc. at 475). Specifically, in real estate transactions, parties to the sale of real property, like signatories of any agreement, are free to tailor their contract to meet their particular needs and to include or exclude those provisions which they choose. Absent some indicia of fraud or other circumstances warranting equitable intervention, it is the duty of a court to enforce rather than reform the bargain struck (Grace v Nappa, 46 NY2d 560, 565 [1979]).
In the absence of fraud or other wrongful act, a party who signs a written contract is presumed to know and have assented to the contents therein (Pimpinello v Swift & Co., 253 NY 159, 162 [1930]; Metzger v Aetna Ins. Co., 227 NY 411, 416 [1920]; Renee Knitwear Corp. v ADT Sec. Sys., 277 AD2d 215, 216 [2d Dept 2000]; Barclays Bank of New York, N.A. v Sokol, 128 AD2d 492, 493 [2d Dept 1987]; Slater v Fid. & Cas. Co. of NY, 277 AD 79, 81 [1st Dept 1950]). In discussing this long-standing rule the court in Metzger stated that
[i]t has often been held that when a party to a written contract accepts it as a contract he is bound by the stipulations and conditions expressed in it whether he reads them or not. Ignorance through negligence or inexcusable trustfulness will not relieve a party from his contract obligations. He who signs or accepts a written contract, in the absence of fraud or other wrongful act on the part of another contracting party, is conclusively presumed to know its contents and to assent to them and there can be no evidence for the jury as to his understanding of its terms. This rule is as applicable to insurance contracts as to contracts of any kind.
(Metzger at 416 [internal citations omitted]).
Provided a writing is clear and complete, evidence outside its four corners "as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing" (W.W.W. Assoc., Inc. v Giancontieri, 77 NY2d 157, 162 [1990]; see Greenfield v Philles Records, Inc., 98 NY2d 562, 569 [2002]; Mercury Bay Boating Club Inc. v San Diego Yacht Club, 76 NY2d 256, 269-270 [1990]; Judnick Realty Corp. v 32 W. 32nd St. Corp., 61 NY2d 819, 822 [1984]). Whether a contract is ambiguous is a matter of law for the court to decide (id. at 162; Greenfield at 169; Van Wagner Adv. Corp. v S & M Enterprises, 67 NY2d 186, 191 [1986]). A contract is unambiguous if the language it uses has "definite and precise meaning, unattended by danger of misconception in purport of the agreement itself, and concerning which there is no reasonable basis for a difference of opinion" (Greenfield at 569; see Breed v Ins. Co. of N. Am., 46 NY2d 351, 355 [1978]). Hence, if the contract is not reasonably susceptible to multiple meanings, it is unambiguous and the court is not free to alter it, even if such alteration reflects personal notions of fairness and equity (id. at 569-570). Notably, it is well settled that silence, or the omission of terms within a contract are not tantamount to ambiguity (id. at 573; Reiss v Financial Performance Corp., 97 NY2d 195, 199 [2001]). Instead, the question of whether an ambiguity exists must be determined from the face of an agreement without regard to extrinsic evidence (id. at 569-570), and an unambiguous contract or a provision contained therein should be given its plain and ordinary meaning (Rosalie Estates, Inc. v RCO International, Inc., 227 AD2d 335, 336 [1st Dept 1996]).
Notably, while the parol evidence rule forbids proof of extrinsic evidence to contradict or vary the terms of a written instrument, it has no application in a suit brought where there are claims of fraud in the execution of an agreement or to rescind a contract on the ground of fraud (Sabo v Delman, 3 NY2d 155, 161 [1957]; Adams v Gillig, 199 NY 314, 319 [1910]; Berger-Vespa v Rondack Bldg. Inspectors Inc., 293 AD2d 838, 840 [3d Dept 2002]).
The essential elements in an action for breach of contract "are the existence of a contract, the plaintiff's performance pursuant to the contract, the defendant's breach of his or her contractual obligations, and damages resulting from the breach" (Dee v Rakower, 112 AD3d 204, 209 [2d Dept 2013]; Elisa Dreier Reporting Corp. v Global Naps Networks, Inc., 84 AD3d 122, 127 [2d Dept 2011]; Brualdi v IBERIA Lineas Aeraes de España, S.A., 79 AD3d 959, 960 [2d Dept 2010]; JP Morgan Chase v J.H. Elec. of NY, Inc., 69 AD3d 802, 803 [2d Dept 2010]; Furia v Furia, 116 AD2d 694, 695 [2d Dept 1986]). Unless expressly proscribed by the Statute of Frauds (General Obligations Law § 5-701), a contract or agreement need not be in writing (see generally McCoy v Edison Price, Inc., 186 AD2d 442, 442-443 [1st Dept 1992] [Alleged oral agreement which, by its terms, was to last for as long as defendant remained in business was incapable of performance within one year, rendering it voidable under Statute of Frauds.]; Karl Ehmer Forest Hills Corp. v Gonzalez, 159 AD2d 613, 613 [2d Dept 1990] ["An oral promise to guarantee the debt of another is barred by the Statute of Frauds."]).
It is well settled that a breach of contract by one party relieves the other from obligations under it and renders the contract unenforceable by the one who has breached it (Grace at 565-566 ["In the instant case, therefore, plaintiff was well within his rights when he refused to consent to an adjournment of the closing and instead insisted upon immediate performance of defendant's obligations. Once the closing was aborted, moreover, it was not necessary for plaintiff to entertain further proposals from defendant, for if defendant had failed to satisfy a material element of the contract, he was already in default."]; Perlman v M. Israel & Sons Co., [*5]306 NY 254, 257 [1954]; Isse Realty Corp. v Trona Realty Corp., 17 NY2d 763 [1966]; Unloading Corp. v State of NY, 132 AD2d 543, 543 [2d Dept 1987]; Melodies, Inc. v Mirabile, 7 AD2d 783, 783 [3d Dept 1958]; Sherry v Fed. Terra Cotta Co., 172 AD 57, 61 [1st Dept 1916]; Zadek v Olds, Wortman & King, 166 AD 60, 63 [1st Dept 1915]; Czerney v Haas, 144 AD 430, 436 [1st Dept 1911]; Hudson Riv. & W.C.M.R. Co. v Hanfield, 36 AD 605, 610 [3d Dept 1899]). Indeed, under the foregoing circumstances, the non-breaching party is discharged from performing any further obligations under the contract and can terminate the contract, sue for damages, or continue the contract (Awards.com, LLC v Kinko's, Inc., 42 AD3d 178, 188 [1st Dept 2007]["When a party materially breaches a contract, the non-breaching party must choose between two remedies: it can elect to terminate the contract or continue it. If it chooses the latter course, it loses its right to terminate the contract because of the default."], affd, 14 NY3d 791 [2010]; Albany Med. Coll. v Lobel, 296 AD2d 701, 702 [3d Dept 2002]; Capital Med. Sys. Inc. v Fuji Med. Sys., U.S.A. Inc., 239 AD2d 743, 746 [3d Dept 1997]; Emigrant Indus. Sav. Bank v Willow Builders, 290 NY 133, 144 [1943]). Stated differently, "[a] party may unilaterally terminate a contract where the other party has breached and the breach is material" (Lanvin Inc. v Colonia, Inc., 739 F Supp 182, 195 [SDNY 1990]; see Exportaciones Del Futuro Brands, S.A. De C.V. v Authentic Brands Group, LLC, 156 NYS3d 857, 858 [1st Dept 2022] ["As a result, plaintiff's breaches of the agreement substantially defeated the parties' contractual objective and constituted material breaches, thus justifying defendants' termination of the contract" (internal quotation marks omitted).]; Valenti v Going Grain, Inc., 159 AD3d 645, 646 [1st Dept 2018] ["However, [defendants'] failure to make monthly payments under the promissory note and to place $60,000 in escrow in anticipation of the accounting constituted a material breach, justifying plaintiff's termination of the contract."]).
Principles generally applicable to contract interpretation apply equally to insurance contracts and insurance policies (Loblaw v Employers' Liab. Assur. Corp., Ltd., 57 NY2d 872, 876 [1982]; State v Am. Mfrs. Mut. Ins. Co., 188 AD2d 152, 154 [3d Dept 1993]). To that end, the court has the responsibility of determining the rights and obligations of the parties under an insurance contract, using the specific language within the policy (Sanabria v Am. Home Assur. Co., 68 NY2d 866, 868 [1986]; State v Home Indem. Co., 66 NY2d 669, 671 [1985]; Stasack v Capital Dist. Physicians' Health Plan Inc., 290 AD2d 866, 866 [3d Dept 2002]).
When the language in an insurance policy is clear and unambiguous, the interpretation of said document and the determination of the rights and obligations of the parties is a question of law to be adjudicated by the court (Kenyon v Knights Templar & Masonic Mut. Aid Ass'n, 122 NY 247, 254 [1890]; Stasack at 866; Stainless, Inc. v Employers Fire Ins. Co., 69 AD2d 27, 32 [1st Dept 1979], aff'd sub nom. Stainless, Inc. v Employers' Fire Ins. Co., 49 NY2d 924 [1980]). However, if the language in the policy is ambiguous, the court can use extrinsic evidence to determine the intent of the parties to the policy and resolution of the rights and obligations of the parties is a question of fact, to be determined by the trier of fact (State of New York at 671; Stainless, Inc. at 32). If the extrinsic evidence is conclusory, failing to equivocally resolve the ambiguity in a policy, interpretation of the policy remains a question of law for the court to decide; deciding any ambiguities against the insurer (State of New York at 671; Stainless, Inc. at 32).
In interpreting an insurance policy, the language of the policy, when clear and unambiguous, must be given its plain and ordinary meaning (U.S. Fid. & Guar. Co. v Annunziata, 67 NY2d 229, 232 [1986]; Sanabria at 868). Moreover, the policy should be [*6]construed in a way "that affords a fair meaning to all of the language employed by the parties in the contract and leaves no provision without force and effect" (Raymond Corp. v Natl. Union Fire Ins. Co. of Pittsburgh, Pa., 5 NY3d 157, 162 [2005]. Stated differently, the language used in the policy "must be found in the common sense and common speech of the average person" Stainless, Inc. at 32-33).
A party seeking or claiming insurance coverage, bears the burden of demonstrating entitlement to coverage (Consol. Edison Co. of New York, Inc. v Allstate Ins. Co., 98 NY2d 208, 218 [2002]; Tribeca Broadway Assoc., LLC v Mount Vernon Fire Ins. Co., 5 AD3d 198, 200 [1st Dept 2004]; Moleon v Kreisler Borg Florman Gen. Const. Co., Inc., 304 AD2d 337, 339 [1st Dept 2003]; Chase Manhattan Bank, N.A. v Travelers Group, Inc., 269 AD2d 107, 108 [1st Dept 2000]; Daniel v Allstate Life Ins. Co., 71 AD2d 872, 872 [2d Dept 1979]). Conversely, an insurer seeking to deny coverage bears the burden of proving that an exclusion to coverage applies (Consol. Edison Co. of New York, Inc. at 218; Technicon Elecs. Corp. v Am. Home Assur. Co., 74 NY2d 66, 73 [1989]).
Indeed, it is well settled that an insured who fails to cooperate with the insurer's investigation of a claim when such cooperation is required by the policy is not entitled to coverage (Weissberg v Royal Ins. Co., 240 AD2d 733, 734 [2d Dept 1997] ["In light of our conclusion that the plaintiffs are precluded from recovering insurance proceeds due to their breach of the cooperation clause."]; Yerushalmi v Hartford Acc. & Indem. Co., 158 AD2d 407, 407 [1st Dept 1990]; Averbuch v Home Ins. Co., 114 AD2d 827, 829 [2d Dept 1985]). This is because a cooperation clause in an insurance policy is designed "to enable the insurer to obtain all knowledge and facts concerning . . . the loss involved while the information is fresh in order to protect itself from fraudulent and false claims" (Weissberg at 734 [internal quotation marks omitted]; 2423 Mermaid Realty Corp. v New York Prop. Ins. Underwriting Ass'n, 142 AD2d 124, 130 [2d Dept 1988]). In order to prevail on a non-cooperation defense so as to properly deny coverage, a defendant must establish "an unreasonable and willful pattern of refusing to answer material and relevant questions or to supply material and relevant document" by the insured (Yerushalmi at 407 ; Averbuch at 829).
Pursuant to Insurance Law § 3407(a),
[t]he failure of any person insured against loss or damage to property under any contract of insurance, issued or delivered in this state or covering property located in this state, to furnish proofs of loss to the insurer or insurers as specified in such contract shall not invalidate or diminish any claim of such person insured under such contract, unless such insurer or insurers shall, after such loss or damage, give to such insured a written notice that it or they desire proofs of loss to be furnished by such insured to such insurer or insurers on a suitable blank form or forms. If the insured shall furnish proofs of loss within sixty days after the receipt of such notice and such form or forms, or within any longer period of time specified in such notice, such insured shall be deemed to have complied with the provisions of such contract of insurance relating to the time within which proofs of loss are required. Neither the giving of such notice nor the furnishing of such blank form or forms by the insurer shall constitute a waiver of any stipulation or condition of such contract, or an admission of liability thereunder.
Thus, it is well settled that when an insurer requests proof of loss arising from a claim under an insurance policy, the failure to timely provide the same precludes recovery under the policy (Anthony Marino Const. Corp. v INA Underwriters Ins. Co., 69 NY2d 798, 800 [1987] [*7]["Plaintiff's failure to file sworn proofs of loss within 60 days after receiving a demand to do so by its insurer, accompanied by proof of loss forms, is a complete defense to plaintiff's action on the insurance policy."]; Igbara Realty Corp. v New York Prop. Ins. Underwriting Ass'n, 63 NY2d 201, 209-10 [1984] ["When an insurer gives its insured written notice of its desire that proof of loss under a policy of fire insurance be furnished and provides a suitable form for such proof, failure of the insured to file proof of loss within 60 days after receipt of such notice, or within any longer period specified in the notice, is an absolute defense to an action on the policy, absent waiver of the requirement by the insurer or conduct on its part estopping its assertion of the defense."]; Going 2 Extremes, Inc. v Hartford Fin. Services Group, Inc., 100 AD3d 694, 694 [2d Dept 2012]; Meserole Factory, LLC v Arch Ins. Group, 88 AD3d 967 [2d Dept 2011]; Matter of State Farm Ins. Co. v Domotor, 266 AD2d 219, 220 [2d Dept 1999]). "A waiver is the intentional relinquishment of a known right with both knowledge of its existence and an intention to relinquish it (Aron Law PLLC v Town of Fallsburg, 199 AD3d 1286, 1286 [3d Dept 2021]; see Homapour v Harounian, 200 AD3d 575, 574 [1st Dept 2021]; Matter of Chenango Forks Cent. School Dist. v New York State, 95 AD3d 1479, 1484, affd, 21 NY3d 255 [2013]), which must be established clearly, unmistakably, and without ambiguity (Aron Law PLLC at 1286; Matter of Chenango Forks Cent. School Dist. at 1484). Accordingly, the right to receive a proof of loss when requested will be waived when the insurer commits an "act said to constitute a repudiation of liability on the policy" (Igbara Realty Corp. at 217; Going 2 Extremes, Inc. at 865). Stated differently,
[a] repudiation of liability by an insurance company excuses the insured from further performance on his part of the conditions of the policies. Such a repudiation excuses the filing of proofs of loss, the production of books and documents, the submission to examination, and the taking of any other preliminary steps by the insured
(Beckley v Otsego County Farmers Co-op. Fire Ins. Co., 3 AD2d 190, 194 [3d Dept 1957]; Matter of State Farm Ins. Co. at 220). Thus, once an insurer denies coverage under the policy, the insured has no obligation to a subsequent request to submit a proof of loss form.
Generally, the failure to exchange a deposition transcript as mandated by CPLR § 3116, prevents its use on a motion for summary judgment (Lalli v Abe, 234 AD2d 346, 347 [2d Dept 1996] ["In the order entered November 22, 1995, partial summary judgment was improperly granted because the court relied upon a deposition of the appellant which had not been forwarded to the plaintiff pursuant to CPLR 3116(a)"]; see Castano v Wygand, 122 AD3d 476, 477 [1st Dept 2014] ["The unsigned deposition transcript of the witness was admissible evidence because the City defendants presented proof, upon reply, that the transcript had been submitted to the witness for signature and return and she failed to do so within 60 day."]). However, the failure to exchange the transcript, will not preclude its use if the opponent of the transcript fails to identify any prejudice by the use of the transcript and the changes in the transcript, which would have been if it had been exchanged prior to the use of the transcript, the party deposed is given an opportunity to make corrections prior to use of the transcript (Matter of Ventura v Gotham Per Diem, Inc., 14 AD3d 753, 754 [3d Dept 2005] ["Although we agree that CPLR 3116(a) should have been complied with, we find the omission not to be error because claimant has identified no changes to her testimony that would have been made if she had been given the opportunity nor has she otherwise shown that any prejudice resulted from this procedural irregularity."]; Horin v EMI Progressive Equities, Inc., 16 Misc 3d 1139[A], *5 [Sup Ct 2007] ["In response to Amrani's assertions, Horin contends that with respect to the issue of who was [*8]the procuring cause of the sale of the Hunter Street properties and the Brighton Street properties, Metro improperly relies upon his deposition testimony without having given him a copy of the transcript. He argues that this violates CPLR 3116(a). Such argument, however, is unavailing since Horin does not assert that the testimony quoted from his deposition was in any way inaccurate."]).
Discussion
In support of its motion, defendant submits an affidavit by Betsy Herlihy (Herlihy), defendant's Claims Manager, who states the following. Defendant issued a homeowner's insurance policy to plaintiff, which insured plaintiff's real property from July 20, 2018 to July 20, 2019. The policy allowed defendant to deny coverage under the policy if plaintiff failed to perform certain things. Specifically, after a loss under the policy, plaintiff was required to promptly notify defendant of the same, cooperate with defendant's investigation of the claim, and provide a sworn statement in proof of loss (SSPL) within 60 days after defendant requested the same. On March 26, 2018, plaintiff notified defendant about an incident that allegedly occurred at 1455. Specifically, plaintiff asserted that water had leaked through 1455's roof. On March 28, 2018, for purposes of investigating the claim, defendant assigned the claim to Patricia Giannoutsos (Giannoutsos), defendant's Claims Adjuster. Defendant also retained Associate Adjusters Network (AAN) to inspect 1455 and determine the value and extent of the damages it allegedly sustained. On May 11, 2018, AAN inspected 1455 and provided plaintiff and defendant with a report. On June 6, 2018, defendant provided plaintiff with forms, which, under the policy, plaintiff was required to complete by listing any items lost as a result of the incident at 1455, and their value. On July 10, 2018, plaintiff, via email, rejected AAC's valuation of damages. Plaintiff also provided defendant with an estimate of the damages sustained at 1455, which was prepared by a contractor retained by plaintiff. Plaintiff's estimate far exceeded the estimate prepared by AAN. On July 3, 2018, plaintiff, via email, notified defendant that she had retained a contractor to prepare a proposal of the work required to repair the damage to 1455. After plaintiff provided the proposal, on July 10, 2018, defendant requested that plaintiff provide additional details regarding the proposal. On July 26, 2018, defendant, via Dwight Murphy (Murphy), telephoned plaintiff to acquire further information regarding the proposal and Murphy was told that the proposal had been prepared by Billy of Pioneer General Construction (PGC). Defendant then retained Glen Hallahan (Hallahan), an investigator, who contacted PGC and was told that it did not employ anyone named Billy nor did PGC have any record concerning 1455. On August 2, 2018, Hallahan went to 1455 to speak to plaintiff, but was denied access by plaintiff's husband. On August 9, 2018, defendant sent PGC the proposal provided by plaintiff. PGC indicated that the proposal was prepared by Bilal Kharayat (Kharayat), PGC's employee. Murphy contacted Kharayat, who confirmed that he prepared the proposal, but refused to provide an address for his employer. Because defendant was unable to confirm the authenticity of the proposal prepared by PGC, defendant retained Vericlaim to further inspect 1455 and verify the sums in PGC's proposal. On August 14, 2018, Vericlaim apprised defendant that plaintiff had denied it access to 1455 and had retained an attorney. On August 28, 2018, defendant conditionally denied the claim based on plaintiff's failure to cooperate with defendant by not allowing Vericlaim to perform a further inspection at 1455. On March 18, 2019, defendant sent plaintiff and her attorney a letter reserving its rights, premised on plaintiff's failure to provide documentation and allow defendant access to 1455. On that same day, defendant also mailed plaintiff and her attorney, inter alia, SSPL forms, requiring that they be [*9]returned within 60 days. Thereafter, plaintiff's counsel confirmed receipt of the foregoing letter, However, the foregoing letter and documents, which were mailed to plaintiff, were thereafter returned to defendant by the post office and marked "returned to sender." On May 21, 2019, defendant sent plaintiff and her attorney a letter denying the claim for her failure to comply with the provisions in the policy. On July 18, 2019, defendant received an undated SSPL form from plaintiff's counsel along with the proposal prepared by PGC.
Defendant submits the documents [FN1]
discussed by Herlihy in her affidavit.
The policy issued by defendant to plaintiff evinces that, per section B(11) of the Property Coverages portion of the policy, it insured, inter alia, the "Residence premises," defined as "[t]he one-family dwelling where you reside . . . and which is shown as the 'residence premises' in the Declarations." section B(9) of the Property Coverages portion of the policy, indicates that the policy covered property damage, meaning "physical injury to, destruction of, or loss of tangible property." Per the "Homeowners Renewal Policy Declarations," 1455 was the location covered by the policy. Pursuant to section I(A)(1) of the Property Coverages portion of the policy, the policy covered "[t]he dwelling on the 'residence premises' shown in the Declarations." Per section I(A)(1) of the Perils Insured Against portion of the policy, the policy insured 1455 "against direct physical loss." Pursuant to section I(C) of the Conditions portion of the policy,
[i]n case of a loss to covered property, we have no duty to provide coverage under this policy if the failure to comply with the following duties is prejudicial to us. These duties must be performed either by you, an 'insured' seeking coverage, or a representative of either: . . .1. Give prompt notice to us or our agent. . . 5. Cooperate with us in the investigation of a claim . . . 8. Send to us, within 60 days after our request, your signed, sworn proof of loss which sets forth, to the best of your knowledge and belief: a. The time and cause of loss; b. The interests of all 'insureds' and all others in the property involved and all liens on the property; c. Other insurance which may cover the loss; d. Changes in title or occupancy of the property during the term of the policy; e. Specifications of damaged buildings and detailed repair estimates; f. The inventory of damaged personal property described in 6. above; g. Receipts for additional living expenses incurred and records that support the fair rental value loss; and h. Evidence or affidavit that supports a claim under E.6. Credit Card, Electronic Fund Transfer Card Or Access Device, Forgery And Counterfeit Money under Section I—Property Coverages, stating the amount and cause of loss.
The claim form memorializing plaintiff's claim evinces that on March 21, 2018, 1455 sustained damage. Specifically, the form states that
[h]eavy snow and ice caused damage to roof, gutters and siding and window glass is cracked. Several lights on outside of house are not working including deck lights. Water [*10]is leaking through roof and then through the ceilings in closets, 3 bedrooms living room and kitchen. There is damage to clothes and personal items in closets and other rooms furniture in all rooms were damaged including mattresses. All rooms except kitchen are carpeted. There seems to be electrical problems to the refrigerator after water came down on top of the refrigerator. Lap top was also damaged.
A document titled status update, created by AAN and dated May 15, 2018, evinces that 1455 was inspected, that there was damage to the ceiling in the livingroom and bedrooms, that there was damage to, inter alia, the refrigerator, that the damage was weather related and that damage to screens and siding was unrelated.
An email by Giannautsos, dated June 6, 2018 and sent to plaintiff, evinces that plaintiff was provided with the amount it would cost to repair the damage to 1455 as calculated by the adjuster. Plaintiff was also asked to complete an attached inventory list. 
An estimate and settlement of damages, dated May 15, 2018, evinces that per defendant, the amount to repair the damage to 1455 totaled $3,434.63.
The content evaluation forms, referred to as an inventory list within Giannautsos' email to plaintiff, evince that they seek a list of any personal property claimed to have been damaged and, inter alia, the price of the same.
A series of email messages between June 6, 2018 and August 9, 2018 evince that in response to receiving defendant's repair estimate and the content evaluation form, on June 6, 2018, plaintiff responded that the amount to effectuate the repairs in defendant's estimate did not seem appropriate. On July 3, 2018, plaintiff emailed Giannautsos the proposal for the repairs created by plaintiff's contractor. On July 10, 2018, Giannautsos emailed plaintiff requesting more information regarding the proposal provided by plaintiff's contractor. On July 11, 2018, plaintiff emailed Giannautsos, asserting that defendant should contact the contractor directly. On August 9, 2018, Giannautsos emailed plaintiff apprising her that the contractor would not cooperate with defendant and that Giannautsos had not yet received the content evaluation form. That same day, plaintiff responded, contending that her contractor was, in fact, very responsive. Also on that same date, Murphy emailed plaintiff to confirm that upon his attempt to speak with the contractor, the latter refused. Plaintiff responded that her contractor had spoken to someone employed by defendant via telephone and that she wanted to arrange a conference call. 
An email sent by Murphy to Giannautsos on August 30, 2018 summarizes the work performed by defendant in connection with plaintiff's claim. The summary states, inter alia, that on July 3, 2018, plaintiff submitted a proposal prepared by a contractor that she retained to evaluate the damage at 1455, listing the cost to repair 1455 as $41,000. The proposal listed PGC as the entity which created the same. On July 26, 2018, plaintiff indicated that the name of the contractor who prepared the proposal was Billy. However, when Murphy called PGC, PGC denied that it employed anyone named Billy or that PGC created a proposal for 1455. Defendant retained Hallahan, who upon reporting to the PGC at the Brooklyn address on the proposal, determined that it was a private home and that the PGC's owner, as listed in the NYS corporation records, was not home. Thereafter, Hallahan found a company named Pioneer General Contracting, Corp. (PGCC) in the Bronx, which was associated with someone named Bilal Khauayat (Khauayat). Thereafter, Murphy attempted to speak to plaintiff at 1455, but her husband did not allow the same. Murphy contacted Khauayat, who confirmed that he worked for PGCC, and that he created the proposal for 1455. However, Khauayat refused to provide the address for PGCC and refused to discuss the proposal. Defendant's special investigations unit [*11]recommended that the claim be closed for non-cooperation, but that it be reopened upon plaintiff's decision to cooperate with defendant's investigation.
A letter from Giannoutsos sent to plaintiff dated August 28, 2019 informs plaintiff that they were denying her claim due to her non-cooperation. The letter describes the investigation performed by defendant on the claim and noted that after Murphy spoke to Khauayat, who refused to cooperate with Murphy, Giannoutsos retained Vericlaim to inspect 1455 and provide a more accurate estimate of the damages to 1455. However, Giannaotsos contends that plaintiff did not allow Vericlaim to perform an inspection. Per the letter, plaintiff was apprised that
[a]s we have been unable to do a second inspection of the damaged property and complete a full investigation, we must deny coverage for your claim . . . Should you decide to pursue the claim, we will need to inspect the property in order to determine whether or not coverage will apply.
A letter from defendant to plaintiff, dated March 19, 2019 states that
[w]e are in the process of investigating the facts and circumstances of the loss as reported above. In the course of our investigation, we may identify issues that may restrict, limit, or exclude your recovery for any or all damages claimed. Please allow this letter to serve as our RESERVATION OF RIGHTS . . . In accordance with the policy conditions, UPC Insurance at this time requests that you provide any additional information or documentation in relation to and/or in support to this loss claim within the next 10 business days. Please provide the Sworn Proof of Loss within 60 days of this letter . . . By not complying with our requests, we may not be able to afford you any further coverage under this policy as a result for this loss at this time and the claim will be closed.
The SSPL forms to which Giannaotsos refers require that plaintiff provide information regarding the claim, such as the date and time of the loss, the names of any lienholders, and how 1455 was occupied. 
An email from defendant to plaintiff's counsel, dated March 19, 2019, evinces that the letter dated March 19, 2019 and the SSPL forms were sent to counsel and that he, in an email sent the very next day, confirmed receipt of the same. 
An undated SSPL form evinces that it is for 1455 and the incident occurring on March 24, 2018. The form states that plaintiff seeks damages totaling $60,320. 
Plaintiff's deposition transcript evinces, in pertinent part, as follows. Plaintiff purchased 1455 in 2007 and resided thereat for 12 years. Plaintiff purchased homeowners insurance for 1455 through a broker. In 2018, during a storm, plaintiff noticed that a window in her bedroom had broken. She then noticed that water was infiltrating 1455 and that the wind had damaged other portions of her home, including her deck, light fixtures and the siding. Plaintiff noticed that water was entering 1455 via the ceiling in many of the rooms. The water caused damage to personal property, including furniture, appliances, and clothing. Additionally, the water damaged the floors within 1455 and caused mold to form therein. Several weeks later, plaintiff contacted her insurance company to apprise it of the damage. The insurance company sent an inspector to view the damage and thereafter, plaintiff retained her own contractor to assess the damage to 1455. The contractor estimated that the damage to 1455 would cost $60,320 to repair. Prior to her deposition, plaintiff had never seen the SSPL shown to her thereat.
Based on the foregoing, defendant establishes prima facie entitlement to summary judgment because the record demonstrates that plaintiff failed to cooperate, as required by the [*12]policy, with defendant's investigation of her claim. 
Preliminarily, contrary to defendant's assertion, summary judgment is unwarranted pursuant to Insurance Law § 3407(a) on grounds, as urged, that plaintiff failed to timely submit SSPL forms. 
As noted above, a defendant seeking summary judgment must establish prima facie entitlement to such relief by affirmatively demonstrating, with evidence, the merits of the claim or defense, and not merely by pointing to gaps in plaintiff's proof (Mondello at 638; Peskin at 634).
Here, defendant's evidence, namely Herlihy's affidavit and the documents appended thereto, establishes that on March 26, 2018, plaintiff notified defendant about an incident that allegedly occurred at 1455 involving water leaking through 1455's roof. Thereafter, on March 28, 2015, for purposes of investigating the claim, defendant assigned the claim to Giannoutsos, defendant's Claims Adjuster, retained AAN to inspect 1455 and determine the value and extent of the damages allegedly sustained, and, on May 11, 2018, after AAN inspected 1455, AAN provided plaintiff and defendant with a report. Thereafter, because on July 10, 2018, plaintiff, via email, rejected AAN's valuation of damages and provided defendant with an estimate of the damages sustained at 1455, which was prepared by a contractor retained by plaintiff, and far exceeded the estimate prepared by AAN, defendant retained Vericlaim to further inspect 1455 and verify the sums in PGCC's proposal. However, on August 14, 2018, Vericlaim apprised defendant that plaintiff had denied it access to 1455 and had retained an attorney. Based on the foregoing, on August 28, 2018, defendant denied the claim based on plaintiff's failure to cooperate with defendant by not allowing Vericlaim to perform a further inspection at 1455. 
Pursuant to section I(C) of the Conditions portion of the instant policy,
[i]n case of a loss to covered property, we have no duty to provide coverage under this policy if the failure to comply with the following duties is prejudicial to us. These duties must be performed either by you, an 'insured' seeking coverage, or a representative of either: . . .1. Give prompt notice to us or our agent. . . 5. Cooperate with us in the investigation of a claim.
With respect to plaintiff's failure to tender timely SSPL forms, while it is well settled that when an insured requests proof of loss arising from a claim under an insurance policy, the failure to timely provide the same precludes recovery under the policy (Anthony Marino Const. Corp. at 800; Igbara Realty Corp. at 209-210; Going 2 Extremes, Inc. at 94; Meserole Factory, LLC at 967; Matter of State Farm Ins. Co. at 220), it is equally well settled that the requirement imposed by Insurance Law § 3407(a) can be waived when the insured commits, an "act said to constitute a repudiation of liability on the policy" (Igbara Realty Corp. at 217; Going 2 Extremes, Inc. at 865). Stated differently,
[a] repudiation of liability by an insurance company excuses the insured from further performance on his part of the conditions of the policies. Such a repudiation excuses the filing of proofs of loss, the production of books and documents, the submission to examination, and the taking of any other preliminary steps by the insured
(Beckley at 194; Matter of State Farm Ins. Co. at 220). 
Here, defendant's own evidence establishes that pursuant to a letter from Giannoutsos sent to plaintiff on or about August 28, 2019, defendant informed plaintiff it was denying her claim due to her non-cooperation. Pursuant to another letter sent to plaintiff approximately six months later, on or about March 19, 2019, defendant, having already denied her claim now [*13]sought the submission of SSPL forms within 60 days. Because defendant had already repudiated liability under the instant policy on August 14, 2018, it waived its right to receive SSPL forms, plaintiff had no obligation to provide them, and such failure could not form the basis for the denial of coverage (Beckley at 194; Matter of State Farm Ins. Co. at 220). 
Notwithstanding the foregoing, the defendant's evidence also establishes that plaintiff failed to cooperate with defendant's investigation as required by the policy such that defendant, under the terms of the policy, had no obligation to provide coverage for the instant claim. Moreover, plaintiff's failure to cooperate also is tantamount to a breach by her of the express terms of the policy, which precludes her breach of contract claim and obviated defendant's obligation to perform under the policy so as to cover her claim.
To be sure, when a contract dispute arises, it is the court's role to enforce the agreement rather than reform it (Grace at 565) by construing it in accordance with the intent of the parties, the best evidence of which being the very contract itself and the terms contained therein (Greenfield at 569). "[W]hen the parties set down their agreement in a clear, complete document, their writing should be enforced according to its terms" (Vermont Teddy Bear Co., Inc. at 475 [internal quotation marks omitted]) and "a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms" (Greenfield at 569). Indeed, principles generally applicable to contract interpretation apply equally to insurance contracts and insurance policies (Loblaw at 876; Am. Mfrs. Mut. Ins. Co. at 154). As such, when the language in an insurance policy is clear and unambiguous, the interpretation of said document and the determination of the rights an obligations of the parties is a question of law to be adjudicated by the court (Kenyon at 254 Stasack at 866; Stainless, Inc. v Employers Fire Ins. Co., 69 AD2d 27, 32 [1st Dept 1979], aff'd sub nom. Stainless, Inc. v Employers' Fire Ins. Co., 49 NY2d 924 [1980]). Generally, an insurer seeking to deny coverage bears the burden of proving that an exclusion to coverage applies (Consol. Edison Co. of New York, Inc. at 218; Technicon Elecs. Corp. at 73).
Moreover, it is well settled that an insured who fails to cooperate with the insurer's investigation of a claim when such cooperation is required by the policy is not entitled to coverage (Weissberg at 734; Yerushalmi at 407; Averbuch at 829). In order to prevail on a non-cooperation defense a defendant must establish "an unreasonable and willful pattern of refusing to answer material and relevant questions or to supply material and relevant document" by the insured (Yerushalmi at 407 ; Averbuch at 829).
Accordingly, here, the evidence tendered by defendant makes it clear that by refusing to allow Vericlaim to inspect 1455, and in failing to facilitate discussions with Kharayat, despite defendant's attempts to procure the same, plaintiff failed to cooperate with defendant's investigation of her claim such that defendant was authorized to deny coverage under the clear and express terms of the policy (Weissberg at 734; Yerushalmi at 407; Averbuch at 829.
In addition to the foregoing, the record establishes that because plaintiff breached the policy, she cannot prevail on her claim for breach of contract. 
The essential elements in an action for breach of contract "are the existence of a contract, the plaintiff's performance pursuant to the contract, the defendant's breach of his or her contractual obligations, and damages resulting from the breach" (Dee at 209; Elisa Dreier Reporting Corp. at 127; Brualdi at 960; JP Morgan Chase at 803; Furia at 695). Here, plaintiff failed to perform her obligations under the policy, such that she fails to establish an element essential to her claim.
Lastly, since, it is well settled that a breach of contract by one party relieves the other from obligations under it and renders the contract unenforceable by the one who has breached it (Grace at 565-566; Perlman at 257; Isse Realty Corp. at 764; Unloading Corp. at 543; Melodies, Inc. at 783; Sherry at 61; Zadek at 63; Czerney at 436; Hudson Riv. & W.C.M.R. Co. at 610), here, where the record establishes that plaintiff breached the policy by failing to cooperate with defendant's investigation, defendant had no obligation to perform by providing coverage and therefore, did not breach the policy when it denied the instant claim.
Based on the foregoing, defendant establishes prima facie entitlement to summary judgment.
Nothing submitted or urged by plaintiff raises an issue of fact sufficient to preclude summary judgment. 
In opposition to the instant motion, plaintiff submits an affidavit wherein she states that
[c]ontrary to Defendant's allegations, the record is clear that I provided access and all proofs of loss to Defendant immediately upon request. Defendant's inspector conducted a full fledge inspection of my property within a few weeks after the loss and I provided Defendant with the estimate I received from my contractor to repair the damages. It was only after Defendant refused to pay a reasonable sum for the damages I sustained to my property that I retained counsel to commence this action.
Plaintiff's affidavit fails to raise a triable issue of fact with regard to whether she allowed Vericlaim to perform a second inspection of 1455, which is the basis of defendant's denial of her claim for non-cooperation with its investigation. To be sure, it is clear that the access plaintiff contends she provided is that she allowed defendant's first investigator, from AAN, to "conduct[] a full fledge inspection of my property within a few weeks after the loss." Since the record establishes that the only inspection performed on defendant's behalf was on or about May 11, 2018, it is clear that this is the investigation that plaintiff, in her affidavit, concedes she allowed defendant to undertake. Thus, the affidavit fails to rebut and/or controvert the evidence upon which defendant's denial for failure to cooperate is premised - plaintiff's failure to allow a second inspection at 1455 in or around August 2018.
To the extent that plaintiff urges denial of the instant motion because defendant has not yet produced a witness for a deposition and because plaintiff has never received a copy of her deposition transcript, such contentions lack merit.
Again, pursuant to CPLR § 3212(f), a motion for summary judgment will be denied if it appears that facts necessary to oppose the motion exist but are unavailable to the opposing party. Denial is particularly warranted when the facts necessary to oppose the motion are within the exclusive knowledge of the moving party (Franklin National Bank of Long Island at 297; De France at 735-736; Blue Bird Coach Lines, Inc. at 971. However, when the information necessary to oppose the instant motion is wholly within the control of the party opposing summary judgment and could be produced via sworn affidavits, denial of a motion for summary judgment pursuant to CPLR § 3212(f) will be denied (Johnson at 270). Additional discovery is unwarranted, where the proponent of the additional discovery has failed to demonstrate that the discovery sought would produce relevant evidence (Frith at 537).
Here, given that plaintiff herself could have controverted the assertion that she did not allow Vericlaim to reinspect 1455, the facts necessary to oppose this motion in a way that would have raised an issue of fact were wholly within her possession. Thus, denial of this motion pursuant to CPLR § 3212(f) is unwarranted this reason alone. Moreover, however plaintiff's [*14]conclusory assertion that the absence of the opportunity to depose defendant, without more, is insufficient to warrant denial of this motion pursuant to CPLR § 3212(f). Again, a party claiming ignorance of facts critical to defeat a motion for summary judgment is only entitled to further discovery and denial of a motion for summary judgment if he or she demonstrates that reasonable attempts were made to discover facts which, as the opposing party claims, would give rise to a triable issue of fact (Sasson at 488; Cruz at 540). Accordingly, the proponent of further discovery must identify facts, which would give rise to triable issues of fact since a court cannot condone fishing expeditions and as such, "[m]ere hope and speculation that additional discovery might uncover evidence sufficient to raise a triable issue of fact is not sufficient" (Sasson at 501). Additional discovery should not be ordered, where the proponent of the additional discovery has failed to demonstrate that the discovery sought would produce relevant evidence (Frith at 537). 
Similarly, plaintiff's contention that the failure to provide her with a copy of her deposition transcript precludes summary judgment because she should be allowed to make corrections to the transcript is unavailing. Indeed, the foregoing is not a basis for further discovery since plaintiff could have pointed to any specific portions of her transcript which were, in her estimation, erroneous transcriptions of her testimony. Plaintiff, of course, made no such attempt.
To be sure, as discussed above, the failure to exchange a deposition transcript as mandated by CPLR § 3116 will not prevent its use on a motion for summary judgment if the opponent of the transcript fails to identify any prejudice by the use of the transcript and the changes in the transcript, which would have been made if it had been exchanged prior to the use of the transcript, had the party deposed been given an opportunity to make corrections prior to use of the transcript (Matter of Ventura at 754; Horin at *5). 
Thus, it follows that the mere assertion that CPLR § 3116 was violated, without more, such as an allegation of prejudice, cannot serve as a basis for denial of a motion for summary judgment pursuant to CPLR § 3212(f). For this same reason, plaintiff's assertion that the Court cannot consider plaintiff's deposition transcript in support of summary judgment is bereft of merit. Again, plaintiff has not indicated what changes, if any, she would have made to the transcript had it been properly exchanged. Moreover, here, plaintiff's deposition testimony was not dispositive to the Court's decision. Accordingly, defendant's motion is granted. It is hereby
ORDERED that the complaint be dismissed with prejudice. It is further
ORDERED that defendant serve a copy of this Decision and Order with Notice of Entry upon plaintiff within 30 days hereof.
This constitutes this Court's decision and Order.
Dated: October 31, 2024
Bronx, New York
HON. FIDEL E. GOMEZ, JSC

Footnotes

Footnote 1:Notably, defendant fails to lay any foundation for the admission of the documents appended to its motion. However, prevailing law holds that on a motion for summary judgment the Court can consider otherwise inadmissible evidence if the opponent of the motion fails to object to the admissibility of said documents (Bank of New York Mellon at 202; see Greene at 1013; Rosenblatt at 55). Thus, here, where plaintiff fails to object to consideration of the documents submitted by defendant for want of foundation, this Court will consider them.